**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SYMANTHA REED, CHARLES GOEZ, JAMES SPAULDING, GARY CRAWFORD, WENDY WHARTON,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **NO. 21-cv-01155-STA-jay** |
| **vs.** | ) ) | |
| **TYSON FOODS, INC.,** | ) ) | |
| **Defendant.** | ) ) | |

---

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING**
**DEFENDANT'S MOTION TO DISMISS**

---

Plaintiffs Symantha Reed, Charles Goez, James Spaulding, Gary Crawford, Wendy

Wharton, and Michelle Whitehead filed this action in the Dyer County Chancery Court against

their employer Tyson Foods, Inc.[1]  Defendant Tyson Foods removed the action, asserting that this

Court has jurisdiction over the matter under diversity-of-citizenship jurisdiction, 28 U.S.C. §1332,

and federal officer jurisdiction, 28 U.S.C. § 1442(a)(1).  On November 3, 2021, the Court denied

Plaintiffs' motion to remand finding that the Court has jurisdiction under 28 U.S.C. § 1442(a)(1).

(ECF No. 20.)  Plaintiffs filed an amended complaint on November 18, 2021.  (ECF No. 21.)

The amended complaint alleges that Defendant Tyson Foods violated their rights under the

First, Fourth, and Fifth Amendments to the United States Constitution; the Tennessee Constitution,

---

[1] Plaintiff Whitehead filed a notice of stipulation of dismissal as to her claims on March 22, 2023.
(ECF No. 68.)

Article I, Section 3; the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12010 *et seq.*; the Nuremberg Code; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3; the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4–21–101 *et seq.*; the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8–50–103 *et seq.*; and Tenn. Code Ann. § 14-1-101 *et seq.* ("Title 14"), by requiring them to be vaccinated with the COVID-19 vaccine prior to November 1, 2021, or else go on unpaid leave without the assurance of ever reclaiming their jobs. Plaintiffs also alleged a state common law claim of assault.

On June 14, 2022, the Court partially granted and partially denied Defendant's first motion to dismiss. (ECF No. 38.) The motion was granted with prejudice as to Claims One (Free Exercise Clause of the First Amendment), Five (RFRA), Eight (FDCA), Nine (Nuremberg Code), Ten (Fourth and Fifth Amendments), and Twelve (common law assault).[2] The motion was also granted with prejudice on Plaintiffs Crawford and Whitehead's Claim Two (religious discrimination under the Tennessee State Constitution). Claim Two seeking injunctive relief on behalf of Plaintiffs Reed, Goetz, Spaulding, and Wharton was remanded to the Dyer County Chancery Court. The motion was granted without prejudice as to Claims Three (Title VII) and Six (ADA) for failure to exhaust administrative remedies.

In its first motion to dismiss, Defendant contended that the remaining state law claims, four (THRA), seven (TDA), and eleven (Title 14), were preempted by (1) President Trump's Executive Order, (2) the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq.*, and (3) the Poultry Production

---

[2] The Court held that Defendant did not act as a government or state actor during the relevant events.

2

Inspection Act, 21 U.S.C. § 451 *et seq*. Because there was nothing in the record to show that the Tennessee Attorney General had been notified of the constitutional challenge to the state statutory claims, the Court denied Defendant's motion to dismiss these three state law claims (claims four, seven, eleven) without prejudice. Defendant was given twenty-eight days in which to notify the Court of its compliance with Tenn. Code Ann. § 29–14–107(b) and Tenn. R. Civ. P. 24.04. The Court denied Defendant's motion to "revise" the order partially granting and partially denying its motion to dismiss on August 10, 2022. (ECF No. 42.) On September 12, 2022, the Court granted the motion to intervene of the State of Tennessee. (ECF No. 48.)

Defendant has now filed a second motion to dismiss the amended complaint. (ECF No. 54.) Plaintiffs have responded to the motion (ECF No. 56), and Defendant has filed a reply to the response. (ECF No. 58.) Additionally, the State has filed a response to the motion to dismiss. (ECF No. 57.) Defendant has filed a reply to the State's response. (ECF No. 59.) For the reasons set forth below, Defendant's second motion to dismiss is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

<u>Standard of Review</u>

The Federal Rules of Civil Procedure require that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint may be attacked for failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a Court will presume that all the factual allegations in the complaint are true and will draw all reasonable inferences in favor of the nonmoving party. *See Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing

*Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). Instead, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). That is, a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Id.* at 570. A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). If the Court cannot "infer more than the mere possibility of misconduct, the complaint has alleged — but has not 'show[n]' — 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.*

<u>Analysis</u>

The Court will first look at Plaintiffs' claim that Defendant discriminated against them based on their religious beliefs and failed to accommodate those beliefs in violation of the THRA (Claim Four). Plaintiffs specifically allege that they hold sincere religious beliefs that preclude them from receiving a COVID-19 vaccine and that "Defendant's accommodation of one year of unpaid leave, with no guaranteed positions upon potential return, is no reasonable accommodation at all, but rather a punitive measure taken against employees who choose to exercise their religious rights." (Amd. Cmplt. ¶¶ 176, 180, ECF No. 21.)

4

The THRA "prohibits discriminatory practice[s] in employment." *Marpaka v. Hefner*, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008). Under the THRA, an employer may not discriminate "against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's . . . religion" and restricts an employer from limiting, segregating, or classifying "an employee . . . for employment in any way that would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect the status of an employee, because of . . . religion." Tenn. Code Ann. § 4-21-401(a)(1)-(2).

Claims under the THRA are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964, although the protections they provide are not necessarily coextensive, as discussed below. *See Barnes v. Goodyear Tire and Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010). In order to establish a prima facie case of religious discrimination based on a disparate treatment theory, Plaintiffs must prove that they are members of a protected group, were qualified for their positions, suffered an adverse employment action, and were treated less favorably than a similarly-situated employee outside the protected class.[3] *Averett v. Honda of Am. Mfg., Inc.*, 2010 WL 522826, at *9 (S.D. Ohio Feb. 9, 2010).

Defendant argues that Plaintiffs have not alleged a prima face case under the THRA for religious discrimination because Defendant treated them the same as they treated other employees. In support of its argument, Defendant cites *Phillips v. Interstate Hotels Corp.*, 974 S.W.2d 680 (Tenn. 1998) (finding, in a public accommodation case under the THRA, no discrimination on the

---

[3] In their amended complaint, Plaintiffs have listed these same elements as being required to state a claim of religious discrimination under the THRA. (Amd. Cmplt. ¶ 171, ECF No. 21.)

basis of race when "all patrons were affected equally by the music selection policy, as every patron, regardless of race, was subjected to the same music selections.").

Plaintiffs have responded that the application of Tyson's vaccine mandate to everyone in the workplace is irrelevant when determining whether an individual plaintiff was discriminated against. They argue that what is relevant is whether Tyson's mandate treated unvaccinated employees like Plaintiffs differently than vaccinated employees based on Plaintiffs' religious beliefs. However, they do not dispute that all Tyson's employees were faced with the same vaccination requirement.

As noted by Defendant, Plaintiffs have cited no authority to support their position and have failed to distinguish *Phillips v. Interstate Hotels Corp.*, in which the Tennessee Supreme Court held that no discrimination exists when everyone is subject to the same policy. "Disparate treatment cases of discrimination occur [when] an employer has treated a particular person less favorably than others because of a protected trait." *Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 426 (Tenn. Ct. App. 2015) (cleaned up). *See also Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995) (explaining that disparate treatment "occurs when an employer treats some employees less favorably than others because of race, religion, sex, or the like").

In the present case, it is undisputed that Plaintiffs were treated no differently than any other employee. All employees were required to be vaccinated by a certain date regardless of their religious beliefs. Accordingly, the portion of Plaintiffs' claim four alleging disparate treatment is dismissed.

Defendant also contends that the THRA does not require an employer to accommodate an employee's religious beliefs.[4]  Plaintiffs acknowledge that there is no explicit language in the THRA imposing a duty to accommodate religious beliefs, but they argue that, because the Tennessee Supreme Court has held that THRA claims are analyzed in the same manner as Title VII claims and Title VII does prescribe a duty to accommodate an employee's religious beliefs, a duty to accommodate can be read into the THRA.[5]

The Court is mindful that THRA claims are analyzed in the same manner as federal Title VII claims. *See Tetro v. Elliott Popham, Inc.*, 173 F.3d 988, 993 (6th Cir. 1999) ("The Tennessee Supreme Court has held that THRA claims are analyzed in the same manner as Title VII claims. (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996))). However, Plaintiffs have conflated the directive that claims under the THRA are "analyzed" in the same manner as Title VII claims and that the purpose of the THRA "is to provide for execution . . . of the policies embodied in the federal civil rights laws" with their position that the THRA imposes a reasonable accommodation requirement.  Contrary to Plaintiffs' argument, the Tennessee Supreme Court has explained that when interpreting Tennessee's anti-discrimination laws, courts are "neither bound by nor restricted by the federal law," although courts "may look to federal law for guidance in enforcing our own anti-discrimination laws." *Barnes*, 48 S.W.3d at 705.

---

[4] This Court was confronted with this issue in a similar case, *Matthews v. Tyson Foods, Inc.*, 2023 WL 25733, at *2 (W.D. Tenn. Jan. 3, 2023). However, there was no need to decide the issue in that case because the plaintiff voluntarily dismissed his THRA claim.

[5]  It is well-settled that Title VII provides for a duty to accommodate an employee's religious beliefs. *See, e.g., Collins v. Tyson Foods, Inc.*, 2023 WL 2731047, at *6 (W.D. Ky. Mar. 30, 2023) (finding that the plaintiff employee had stated a Title VII failure to accommodate claim based on Tyson's proposed accommodation for unvaccinated workers to take one year of unprotected, unpaid leave and possibly return to their positions only if they become immunized, which a jury could find was not a reasonable accommodation for plaintiff's religious beliefs).

When the language of the THRA differs from that found in Title VII, courts must conduct their own analysis on whether to follow federal law when interpreting the THRA. *See Booker v. The Boeing Co.*, 188 S.W.3d 639, 647 (Tenn. 2006) ("[W]e will not apply the reasoning and conclusions of federal civil rights decisions [when] doing so would conflict with the THRA."). Moreover, courts should "resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). This Court is not aware of any case law holding that the THRA requires employers to accommodate an employee's religious beliefs and practices, and the Court will not read such a requirement into the statute. Plaintiffs' Claim Four fails as a matter of law because there is no duty to accommodate an employee's religious beliefs under the THRA.

In Claim Seven, Plaintiffs assert a claim under the Tennessee Disability Act[6] which "prohibits private employers from discriminating against employees 'based solely upon any physical mental or visual disability of the applicant.'" *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 841 (Tenn. Ct. App. 2009) (quoting Tenn. Code Ann. § 8-50-103(b)). Plaintiffs allege that Defendant views them as being "disabled" because they lack immunity to COVID-19 obtained by being vaccinated as opposed to natural immunity from a prior infection.

There are three elements to a claim for discrimination under the TDA: a plaintiff must show: "(1) that the individual was qualified for the position; (2) that the individual was disabled; and (3) that the individual suffered an adverse employment action because of that disability."

---

[6] The Tennessee Disability Act was formerly known as the Tennessee Handicap Act. Effective April 7, 2008, the legislature amended the THA to change all references to "handicap" within the Act to "disability" including changing the name; however, the substance of the THA was not changed. *See* 2008 Tenn. Pub. Acts, ch. 706, §§ 3, 5.

*Bennett*, 315 S.W.3d at 841 (citations omitted). "The threshold issue, however, is whether the claimant is 'disabled.'" *Id.* (citations omitted).

Although the TDA does not define the term "disabled," the definition contained in the THRA is applicable to TDA claims. *Jones v. Sharp Elecs. Corp.*, 2014 WL 806131, at *3 (Tenn. Ct. App. Feb. 28, 2014) (citation omitted). The THRA defines disability with respect to a person as:

> (i) A physical or mental impairment that substantially limits one (1) or more of such person's major life activities;
> (ii) A record of having such an impairment; or
> (iii) Being regarded as having such an impairment[.]

Tenn. Code Ann. § 4–21–102(3)(A).

Defendant contends, and the Court agrees, that Plaintiffs have failed to allege a cause of action in Claim Seven because Plaintiffs have not shown that their unvaccinated status equates to an actual or perceived disability. The Tennessee Court of Appeals in *Bennett v. Nissan N. Am., Inc.*, explained that "merely having an impairment does not make one disabled." 315 S.W.3d at 843 (citation omitted). Instead, a "claimant must also demonstrate that the impairment substantially limits one or more major life activities." *Id.* (citations omitted). *Bennett* referenced the EEOC's "specialized definition" of "substantially limits" when the "major life activity under consideration is that of working." *Id.* Thus, a person claiming that his impairment significantly limits his major life activity of working must show that the impairment

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Id.* (citing 29 C.F.R. § 1630.2(j)(3)(i)). The *Bennett* Court also looked at the Tennessee Supreme Court's examination of the term "substantially limited."

9

The Tennessee Supreme Court recognized this principle when it held that "an impairment that may disqualify one from working at a job of choice does not limit a major life activity," but that an individual's physical or mental impairment would be considered as substantially limiting the major life activity of working if it disqualified him or her from a broad class of jobs.

*Id.* at 844 (citing *Barnes*, 48 S.W. 3d at 706).

In the present case, Plaintiffs have not alleged that their "impairment" prevents their working at other jobs.[7] Thus, even if Plaintiffs' lack of vaccinated COVID-19 antibodies may be considered an "impairment," that lack clearly does not prevent their obtaining other employment, *i.e.*, their "general employability" has not been affected. *See Cecil v. Gibson*, 820 S.W.2d 361, 365 (Tenn. Ct. App. 1991).[8] Therefore, Plaintiffs have not shown that they have a disability within the meaning of the TDA.

---

[7] The Court has assumed for the purpose of this analysis only that Plaintiffs' unvaccinated status constitutes an impairment.

[8] *See also Speaks v. Health Systems Management, Inc.*, 2022 WL 3448649 (W.D.N.C. Aug. 17, 2022) (agreeing with the defendant's position that "the fact that Speaks – like all their other employees – was required to be vaccinated or that she refused to become vaccinated are insufficient to show that she was disabled under the meaning of the ADA.")

The Company did not classify Speaks as having any "impairment" that limited one of her "major life activities." Instead, she was simply required to become vaccinated under the Company's COVID-19 policy applicable to all employees, which, while it ultimately led to Speaks' termination from Health Systems, plainly did not impair her ability to work (for example, for another company).

Simply put, inferring that the Company classified Speaks as impaired by requiring her to become vaccinated or seek an exemption would mean that Health Systems considered all its employees to have an "impairment," which is of course not a plausible inference, particularly in light of the possibility of an exemption.

2022 WL 3448649, at *5 (W.D.N.C. Aug. 17, 2022). *Accord Jorgenson v. Conduent Transp. Sols., Inc.*, 2023 WL 1472022, at *4 (D. Md. Feb. 2, 2023); *Sharikov v. Philips Med. Sys. MR, Inc.*, 2023 WL 2390360, at *7 (N.D.N.Y. Mar. 7, 2023).

However, even if Plaintiffs had properly alleged that they have a disabling impairment within the meaning of the TDA, there is no duty to accommodate an employee's disability under the TDA.

> The[] elements [of a TDA claim] are "very similar to those of the ADA, but do not include a 'reasonable accommodation' component.'" *Bennett*, 315 S.W.3d at 841–42 (citing *Roberson v. Cendant Travel Servs., Inc.*, 252 F.Supp.2d 573, 583 (M.D. Tenn. 2002)). *See also Jones v. Sharp Elecs. Corp.*, No. W2013–01817–COA–R3CV, 2014 WL 806131, at *3 (Tenn. Ct. App. Feb. 28, 2014) ("Unlike its federal counterpart, the Americans with Disabilities Act ..., the TDA does not impose a duty on employers to make reasonable accommodations to accommodate a disabled employee"). Thus, courts will not find that an employer discriminated against its employee if the employee's disability prevented or impaired him or her from performing the job's duties. *Jones*, No. W2013-01817–COA–R3CV, 2014 WL 806131, at *3 (citing *Bennett*, 315 S.W.3d at 841).

*Oliver v. Titlemax*, 149 F. Supp. 3d 857, 865 (E.D. Tenn. 2016). *Accord Hilliard v. Dolgencorp*, LLC, 2019 WL 1377263, at *11 (Tenn. Ct. App. Mar. 26, 2019) (citing *Jones*); *Russo v. Moore Ingram Johnson & Steele, LLP*, 2022 WL 1787102, *17 (M.D. Tenn. 2022) ("[T]he TDA differs from the ADA in one critical respect. Unlike the ADA, the TDA does not impose a duty on employers to make reasonable accommodations for a disabled employee.") For these reasons, Defendant's motion to dismiss Claim Seven is granted.

In Claim Eleven, Plaintiffs allege that Defendant violated Tenn. Code Ann. § 14-2-102 which provides that "[a] private business, governmental entity, school, or local education agency shall not compel or otherwise take an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason," Tenn. Code Ann. § 14-2-102(a).[9] The Tennessee General Assembly enacted Title 14 of the Tennessee Code Annotated, effective November 12, 2021, to create a number of protections

---

[9] Defendant has claimed that this section does not apply to a "private business" such as itself, but clearly it does.

related to COVID-19. Title 14 grants a person injured as a result of such a violation a private right of action to seek "injunctive relief and to recover compensatory damages and reasonable attorneys' fees against an alleged violator." § 14–6–103.

Before the Court can look at the merits of Plaintiffs' Title 14 claim, Defendant's argument that Plaintiffs' state statutory claims are preempted by federal law must be decided.[10]   If federal law "imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law," "the federal law takes precedence and the state law is preempted." *Murphy v. National Collegiate Athletic Assn.*, 138 S. Ct. 1461, 1480 (2018).

In support of its argument that federal law preempts Tennessee's COVID law, and, therefore, the statute is unconstitutional, Defendant cites an April 28, 2020 Executive Order issued by the President of the United States as well as guidance from the Centers for Disease Control ("CDC") and the Occupational Safety and Health Administration ("OSHA").   In Defendant's view, the Executive Order bound meat and poultry processors like Defendant to take all steps to continue their operations during the COVID-19 pandemic.   The President acted in response to orders issued in some states that meat and poultry processors suspend operations to curb outbreaks of COVID-19 among employees at processing plants.   The Executive Order and the CDC and OSHA guidance on which the Executive Order were based preempt Tennessee's attempt to set a different policy on COVID-19 and its impact on Defendant's meat processing operations in the State of Tennessee.

---

[10] Defendant also raised a preemption defense as to Plaintiffs' other state law claims. However, because the Court has decided those claims on the merits, the Court need not reach the issue of preemption for Claims Four and Seven. *See Torres v. Precision Indus., Inc.*, 938 F.3d 752, 755 (6th Cir. 2019) (holding that "courts should not address a question of preemption if they can resolve the case on other grounds").

Defendant further argues that the Federal Meat Inspection Act ("FMIA") preempts Tennessee's Title 14.  The FMIA contains an express preemption provision, stating that the Act precludes state lawmaking on any matter "within the scope" of the FMIA.[11]  Defendant argues that the test is whether the federal government could have adopted "the requirement at issue," presumably a reference to mandatory worker vaccination.  In support of its position, Defendant points to the FMIA's implementing regulations addressed to employee hygiene and infectious disease.  Defendant contends that because the USDA has adopted regulations to control "infectious disease," Tennessee's regulation on proof of vaccination falls "within the scope" of the FMIA, and, therefore, the FMIA expressly preempts Tenn. Code Ann. § 14–2–102(a).

According to the State, Defendant has not shown how the Executive Order preempts Title 14's anti-discrimination provision.  Title 14 does not directly conflict with the Executive Order.  Defendant has not shown that it cannot comply with both the Executive Order and Title 14 or that Title 14 is an obstacle to the Executive Order.  To the extent that Defendant has argued that the Executive Order intended to occupy the entire field of meat processing operations, the Executive Order cuts against that argument.  The Executive Order delegated authority to the Secretary of Agriculture.  However, the Executive Order specifically excluded a delegation of authority to compel performance of "contracts of employment."  The State contends that this facet of the Executive Order does not suggest an intent to occupy a field to the exclusion of state regulation.

---

[11] Defendant also raises a preemption defense under the Poultry Production Inspection Act ("PPIA"), 21 U.S.C. § 451 *et seq*.  Defendant acknowledges that the PPIA is "substantially identical" to the FMIA and relies on cases interpreting the FMIA for its PPIA preemption argument. (Mot. p. 13, ECF No. 55.) In turn, the Court finds that Title 14 is not preempted by the PPIA for the same reasons that it is not preempted by the FMIA. *See Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993, 997 (2d Cir. 1985) (noting that the Inspection Acts "contain substantially identical preemption language").

The State of Tennessee goes on to argue that the FMIA does not preempt Title 14.  The FMIA "protects consumers from adulterated meat products" and not "workers from infectious disease."  (State's Br. 9, ECF No. 57.)  The "infectious disease" regulations cited by Defendant have as their purpose the safe handling and processing of meat, not the protection of meat processing workers.  Defendant has not shown that its vaccine mandate was necessary to prevent the adulteration of meat.  As a matter of fact, Defendant has since lifted their vaccine mandate.

The Supremacy Clause of the U.S. Constitution states that "the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  "The phrase 'Laws of the United States' encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Practices Litig.*, 65 F.4th 851, 859 (6th Cir. 2023) (quoting *City of New York v. F.C.C.*, 486 U.S. 57, 63, 108 S. Ct. 1637, 100 L.Ed.2d 48 (1988)).  This simply means "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S. Ct. 2476, 115 L.Ed.2d 532 (1991) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 Wheat. 1, 211, 6 L. Ed. 23 (1824)).

The Supreme Court has adopted what it has described as "two cornerstones" of its "pre-emption jurisprudence."  *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 173 L.Ed.2d 51 (2009).  First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L.Ed.2d 700 (1996)).  Also, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the

historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id*. So the "inquiry is largely one of federal purpose, that is, whether a statute or regulation evinces an 'intent to supplant state authority in a particular field.'" *Mortier*, 501 U.S. at 604–05, 111 S. Ct. 2476.

Preemption is an affirmative defense. *Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 852 (6th Cir. 2023). As a result, a defendant asserting preemption has "the burden of proof in establishing preemption as grounds for dismissal." *In re Ford Motor*, 65 F.4th at 859 (citing *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007)). This means Defendant, as the party seeking dismissal here, must show "that federal preemption potentially applies to the facts and circumstances of the suit." *Brown*, 481 F.3d at 913 (setting out the burden of proof when a party seeks summary judgment on its preemption defense).

The issue presented in this case is whether Executive Order 13917 and the Federal Meat Inspection Act preempt Plaintiffs' claim under Tenn. Code Ann. § 14–2–102(a). Preemption comes in more than one variety. "State-law claims can be preempted expressly in a federal statute or regulation, or impliedly, where congressional intent to preempt state law is inferred." *In re Ford Motor*, 65 F.4th at 859 (citing *McDaniel*, 893 F.3d at 944). Statutes containing an express preemption clause may make clear an intent that federal law "is displacing or prohibiting the enactment of state legislation in a particular area." *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021).

When the federal government does not act with the express intent of preempting state law, preemption may nevertheless result by implication. So-called implied preemption takes two forms, field preemption and conflict preemption. "Field preemption occurs 'where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room

15

for the States to supplement it.'" *Id.* (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L.Ed.2d 73 (1992)).  Conflict preemption arises when federal law "has not entirely displaced state regulation over the matter in question." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S. Ct. 615, 78 L.Ed.2d 443 (1984). The federal law may still preempt state law "to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* (internal citations omitted).  The Sixth Circuit has remarked that field preemption and conflict preemption, while "separate categories," are not "rigidly distinct." *Matthews*, 15 F.4th at 720 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5, 110 S. Ct. 2270, 110 L.Ed.2d 65 (1990)).

In the final analysis, all forms of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Coll. Athletic Ass'n*, 138 S. Ct. 1461, 1480, 200 L. Ed.2d 854 (2018).

Defendant first argues that Executive Order 13917 preempts Plaintiffs' claims for the violation of Tenn. Code Ann. § 14–2–102(a).  On April 28, 2020, the President issued Executive Order 13917, directing the Secretary of Agriculture to "take all appropriate action under [the Defense Production Act of 1950] to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA."  Executive Order on Delegating Authority Under the DPA With Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of Covid-19, Apr. 28, 2020, 85 F.R. 26313, 2020 WL 2060381, at *1 (hereinafter "Executive Order 13917" or "Executive Order").

16

The President issued Executive Order 13917 pursuant to powers Congress granted the President under the Defense Production Act of 1950 ("DPA"). The DPA, 50 U.S.C. § 4511, authorizes "the President to direct private companies to prioritize federal contracts in exigent circumstances." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 736 n.3 (8th Cir. 2021). Section 4511(a) grants the President the power

> (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.

50 U.S.C. § 4511(a). Section 4511(b) then conditions the President's authority to "control the general distribution of any material in the civilian market" under § 4511(a) upon a finding that "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." § 4511(b).

Section 1 of the Executive Order set out the findings required under § 4511(b). The President adopted a policy statement regarding the importance of "processors of beef, pork, and poultry ('meat and poultry') in the food supply chain" and their role in providing "a continued supply of protein" for the country. Executive Order, 2020 WL 2060381, at *1. The Executive Order noted "outbreaks of COVID-19 among workers at some processing facilities," which had resulted in "the reduction in some of those facilities' production capacity." *Id*. The Executive Order also noted "recent actions in some States," by which state governments had required "the complete closure of some large processing facilities." *Id*. The Executive Order found that these

state-ordered closures had "differ[ed] from or be[en] inconsistent with interim guidance recently issued by the Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor entitled 'Meat and Poultry Processing Workers and Employers' providing for the safe operation of such facilities." *Id*. The President found that "[s]uch closures threaten[ed] the continued functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency." *Id*. Based on these policy considerations, the Executive Order found that meat and poultry met "the criteria specified in [§ 4511(b)]." *Id*.

Having made the determination required by § 4511(b), the President invoked the authority granted under § 4511(a) "to require performance of contracts or orders (other than contracts of employment) to promote the national defense over performance of any other contracts or orders, to allocate materials, services, and facilities as deemed necessary or appropriate to promote the national defense, and to implement" other provisions of the DPA "with respect to food supply chain resources, including meat and poultry, during the national emergency caused by the outbreak of COVID-19 within the United States." Executive Order, 2020 WL 2060381, at *2. The President then delegated his DPA authority to the Secretary of Agriculture and directed the Secretary to "use the authority [under § 4511(a) of the DPA] . . . to determine the proper nationwide priorities and allocation of all the materials, services, and facilities necessary to ensure the continued supply of meat and poultry, consistent with the guidance for the operations of meat and poultry processing facilities jointly issued by the CDC and OSHA" and "issue such orders and adopt and revise appropriate rules and regulations as may be necessary to implement this order." *Id*. The President made the delegation pursuant to 3 U.S.C. § 301, where Congress granted the President authority to delegate "any function which is vested in the President by law" to "the head

of any department or agency in the executive branch, or any official thereof who is required to be appointed by and with the advice and consent of the Senate." 3 U.S.C. § 301.

The question is whether the Executive Order preempts by implication Tenn. Code Ann. § 14–2–102(a). Tenn. Code Ann. § 14–2–102(a) prohibits a "private business" from "compel[ling] or otherwise tak[ing] an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason." Tenn. Code Ann. § 14–2–102(a). The Court has previously construed this paragraph to have as one of its required elements proof that a person holds an objection to receiving a COVID-19 vaccine for any reason. *Sadler v. Tyson Foods, Inc.*, No. 1:22-CV-2203-STA-JAY, 2022 WL 1721058, at *3 (W.D. Tenn. May 27, 2022). This construction is consistent with the Tennessee General Assembly's finding that "every person within this state is and must remain free to choose or to decline to be vaccinated against COVID-19 without penalty or threat of penalty." § 14–1–102(6). For the following reasons, the Court holds that Defendant has not overcome the presumption against preemption and shown that Executive Order 13917 preempts Tenn. Code Ann. § 14–2–102(a).

First, the Executive Order contains no express preemption clause and does not directly countermand or override any state law or regulation to the contrary. Even though the President apparently acted in response to state-ordered closures of meat and poultry facilities, the Executive Order did not expressly reverse a state-ordered closure of any particular meat or poultry facility. In fact, the only directive in the Executive Order is addressed to the Secretary of Agriculture. The Executive Order is primarily an invocation of the President's DPA authority and a delegation of that authority to the Secretary. Other than the President's instructions to USDA, the Executive

Order contains no other express directives at all.  There is no reason to find that Executive Order 13917 expressly preempted Tennessee law.

In order to avail itself of the preemption defense then, Defendant must show that the Executive Order preempted Tenn. Code Ann. § 14–2–102(a) by implication.  Defendant argues that the Court can infer preemption in this case under the doctrine of field preemption.  Field preemption arises by implication when "federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'"  *Murphy*, 138 S. Ct. at 1480 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140, 107 S. Ct. 499, 93 L.Ed.2d 449 (1986)).  For example, the Supreme Court has held that federal law preempts parallel state laws under the doctrine of field preemption in the area of alien registration.  *Arizona v. United States*, 567 U.S. 387, 401, 132 S. Ct. 2492, 2502 (2012) ("[T]he Federal Government has occupied the field of alien registration.").  According to Defendant, Executive Order 13917 occupied the field of the entirety of meat and poultry processing plant operations.

The Court holds, however, that Defendant has not carried its burden to support such a capacious reading of the Executive Order, at least at the pleadings stage.  Defendant has not actually shown that Executive Order 13917 was intended to occupy a field as broad as "the entirety of meat and poultry processing plant operations."  The Executive Order found for purposes of the DPA that meat and poultry were "scarce and critical material essential to the national defense," delegated the President's authority "to require performance of contracts" and "to allocate materials, services, and facilities" for purposes of national defense to the Secretary of Agriculture, and directed the Secretary to "take all appropriate action under [the DPA] *to ensure that meat and poultry processors continue operations* consistent with the guidance *for their operations jointly*

*issued by* the CDC and OSHA." Executive Order, 2020 WL 2060381, at *1 (citing 50 U.S.C. § 4511(b) (emphasis added)).

If Executive Order 13917 occupied a field and thus implicitly preempted any state law or directive, it addressed which sovereign had the authority to order meat processors like Defendant to suspend operations due to the outbreak of the pandemic: the federal government or the states where Defendant's meat processing plants were located. Even at that, the Executive Order merely delegated the President's DPA powers to USDA and directed the Secretary to exercise that authority so "*that meat and poultry processors continue operations* consistent with the guidance *for their operations jointly issued by* the CDC and OSHA." After all, the Executive Order came after some states had ordered meat processors like Defendant to suspend its operations. In other words, the Executive Order addressed, and only indirectly and by implication, whether meat and poultry processors should follow federal or state directives to operate or shut down. This does not suggest a sweeping intent to occupy a field as broad as "the entirety of meat and poultry processing plant operations."

What is more, the Executive Order did not direct meat and poultry processors like Defendant to take any particular action. The President merely ordered USDA to use authority under the DPA to make sure the meat and poultry industry continued to operate, even if a state government had ordered them to limit or curtail their operations. Assuming the Secretary had issued such an order to a meat processor like Defendant and a state had issued a contradictory order to shut down, the Executive Order would have made it impossible for meat and poultry producers to comply with both orders. The Executive Order arguably preempted state orders by implication because of this possibility of a direct conflict between state directives and any

subsequent order issued by USDA, not because the Executive Order occupied the field of "the entirety of meat and poultry processing plant operations."

The Executive Order also addressed by implication a secondary, though perhaps no less important, question of whether state officials could decide the public health or occupational safety rules for the operation of meat and poultry processing plants and, relatedly, whether states could enforce their rules to regulate or even suspend the operation of meat and poultry processing plants. The Executive Order instructed the USDA to issue orders for meat and poultry processing plants to ensure continued operations in accordance with CDC and OSHA guidance "jointly issued" by the federal agencies specifically for the operation of meat and poultry processing plants.

But that is clearly not the same thing as directing "the entirety of meat and poultry processing plant operations." The Executive Order did not spell out how meat processors were to operate in the midst of a global pandemic. The Executive Order did not cite or incorporate any specific public health or occupational safety guidance. The Executive Order certainly did not reach the question of mandatory vaccination for meat and poultry workers, which comes as no surprise. The President issued the Executive Order months before COVID-19 vaccinations had received emergency use authorization for the public, and more than a year before Tennessee enacted Title 14; *a fortiori*, nothing in the Executive Order addressed the vaccination of employees working in a meat or poultry processing facility or required them to provide proof of vaccination.

Furthermore, the Executive Order directed USDA to take certain actions, not meat and poultry processors like Defendant. Defendant has not shown whether the Secretary of Agriculture issued any such orders to direct Defendant's operations or whether the Secretary ever exercised the delegated DPA authority at all. A May 2020 press release from the Secretary largely reiterates what is already contained in the Executive Order, stressing "the [USDA's] clear expectations for

the implementation of [the Executive Order,]" and the Executive Order's directive for "plants to follow the [CDC and OSHA] guidance specific to the meat processing industry to keep these critical facilities open while maintaining worker safety." USDA Release No. 0243.20.  Assuming the press release had the force of law and any preemptive effect at all, it merely echoed the points already contained in the Executive Order.  Otherwise, there is nothing before the Court to indicate whether the Secretary issued any such orders pursuant to the powers delegated to him in Executive Order 13917.  *See Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 234 (5th Cir. 2022) ("The USDA did not issue a DPA order to Tyson or any other meatpacking company.").

To the extent the Executive Order addressed meat and poultry operations at all, the Executive Order did not suggest an intent to occupy the field of "the entirety of meat and poultry processing plant operations."  The Executive Order instructed USDA to issue orders for the industry in accordance with "*guidance for [meat and poultry processing] operations jointly issued by* the CDC and OSHA."  The President's determination that meat and poultry processing plants should act in conformity with *joint* CDC and OSHA *guidance* issued for the meat and poultry industry further limited the scope of the federal directive, that is, the field the Executive Order occupied.

For example, the Executive Order mentions agency guidance, not regulatory action.  Both the CDC and OSHA have statutory authority to promulgate regulations for very different spheres of daily life.  The CDC is concerned with public health.  42 U.S.C. § 264(a) (section of the Public Health Act of 1944 authorizing "the Surgeon General, with the approval of the Secretary [of Health and Human Services] to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases . . . ."); *see also* 42 C.F.R. § 70.2 (delegating this authority to the CDC). And OSHA exists to ensure "*occupational*

safety—that is, "safe and healthful working conditions" by enforcing occupational safety and health standards adopted for that purpose. *Nat'l Federation of Indep. Business v. Dept. of Labor, O.S.H.A.*, 142 S. Ct. 661, 663, (2022) (quoting 29 U.S.C. § 651(b) (emphasis in original)).[12]  The Executive Order never referenced regulations adopted by either agency, only guidance.

And the guidance identified in the Executive Order was not general pandemic suggestions for public health (CDC) or safer workplaces (OSGA) but guidance jointly issued by the CDC and OSHA and only joint guidance addressed specifically to meat and poultry processing plants. Rather than showing an intent to occupy "the entire field of meat and poultry operations," the Executive Order settled a more discrete question and directed the meat and poultry industry to follow federal guidance on public health and workplace safety where the agencies acted in concert to adopt measures specific to the industry and pandemic conditions.  The qualified nature of the guidance described in the Executive Order does not show that the President intended to occupy the field of "the entirety of meat and poultry processing plant operations."

The one instance of the CDC and OSHA issuing the kind of joint guidance mentioned in the Executive Order was silent on the topic of worker vaccinations.  In interim guidance issued July 9, 2020, the CDC advised that "critical infrastructure workers" like "meat and poultry processing workers" could be allowed to continue to work "following potential exposure to COVID-19, provided they remain asymptomatic, have not had a positive test result for COVID-

---

[12] The authority of both agencies, even during a declared state of emergency, is not without limits. *Ala. Assoc. of Realtors v. Dept. of Health & Human Servs.*, 141 S. Ct. 2485, 2487, 210 L.Ed.2d 856 (2021) (holding that CDC did not have power to impose nationwide moratorium on the eviction of renters during pandemic); *Nat'l Federation of Indep. Business*, 142 S. Ct. at 665 (holding that challengers were likely to prevail on the merits of their claim that the Occupational Health and Safety Act did not authorize OSHA to issue a nationwide vaccine mandate covering employers with more than 100 employees and preempting any state law to the contrary, because the statute "empowers the Secretary [of Labor] to set *workplace* safety standards, not broad public health measures").

24

19, and additional precautions are implemented to protect them and the community."  CDC, Meat and Poultry Processing Workers and Employers: Interim Guidance from CDC and the Occupational Safety and Health Administration (OSHA) (July 9, 2020), https://stacks.cdc.gov/view/cdc/90395.  The July 2020 guidance provided a number of recommendations to prevent the spread of the virus in meat and poultry processing facilities.  Of course, no vaccine was available as of that date, so mandating worker vaccinations was not one of the CDC/OSHA recommendations.  It follows that no preemption of a Tennessee law adopted in 2021 protecting persons on the basis of opposition to vaccines or vaccination status occurred as a result of the July 9, 2020 CDC/OSHA guidance for "critical infrastructure workers."

Defendant has not cited any other guidance jointly issued by the CDC and OSHA addressed to operations in meat and poultry processing plants.  When vaccines were made available to the public at large in early 2021, the OSHA guidance cited by Defendant did not mandate vaccination for meat and poultry workers.  In guidance originally issued January 29, 2021, and updated June 10, 2021, OSHA cautioned that the virus spread "mainly among unvaccinated people who are in close contact with one another—particularly indoors and especially in poorly ventilated spaces."  OSHA described vaccination as "the key element in a multi-layered approach to protect workers" and remarked on the effectiveness of vaccines authorized by the U.S. Food and Drug Administration.  OSHA, Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace (Jan. 29, 2021), https://www.osha.gov/coronavirus/safework# what-workers-need-to-know.

Despite these findings, the OSHA guidance did not mandate vaccination or preempt any other legal protections or exemptions from vaccination.  On the contrary, the guidance recognized that some employers were developing "COVID-19 prevention programs that include[d] a number

of important steps to keep unvaccinated and otherwise at-risk workers safe" like the adoption of "administrative policies (*e.g.* vaccination policies)."  But OSHA "suggest[ed] that employers consider adopting policies that require[d] workers to get vaccinated or to undergo regular COVID-19 testing–in addition to mask wearing and physical distancing–if they remain[ed] unvaccinated." *Id*.  Rather than a mandate, this guidance was presented only as a "suggestion" and provided alternatives to mandatory vaccination. For purposes of the Court's preemption analysis, the OSHA guidance from 2021 was not directly applied to meat and poultry processing plants or issued jointly with the CDC.  Defendant has not shown then how the OSHA guidance preempted Tenn. Code Ann. § 14–2–102(a).

On the question of federal purpose, Defendant has not shown that the President intended to exercise his statutory authority under the DPA to occupy "the entirety of the field of meat and poultry processing plant operations," including a vaccine mandate for workers in the meat and poultry industry.  *Mortier*, 501 U.S. at 604–05, 111 S. Ct. 2476 (remarking that the "inquiry is largely one of federal purpose, that is, whether a statute or regulation evinces an 'intent to supplant state authority in a particular field'").  Thus, Defendant has not shown how Executive Order 13917 preempts Tenn. Code Ann. § 14–2–102(a).

Defendant raises a separate argument that the FMIA and some of its regulations preempt Tenn. Code Ann. § 14–2–102(a), either expressly or by implication.  Section 608 of the FMIA directs the Secretary of Agriculture to monitor meat processors through inspections to ensure "sanitary conditions" in meat processing facilities.  21 U.S.C. § 608.  Section 608 also requires the Secretary "to prescribe the rules and regulations of sanitation under which such establishments shall be maintained." *Id*.  In enacting the FMIA, Congress found that "[m]eat and meat food products are an important source of the Nation's total supply of food" and that "[i]t is essential in

the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged."  21 U.S.C. § 602.  "The FMIA regulates a broad range of activities at slaughterhouses to ensure both the safety of meat and the humane handling of animals."  *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455, 132 S. Ct. 965, 181 L.Ed.2d 250 (2012).

In order to achieve the FMIA's "dual goals of safe meat and humane slaughter," the USDA's Food Safety and Inspection Service ("FSIS") "has responsibility for administering the FMIA" and issues "extensive regulations to govern the inspection of animals and meat, as well as other aspects of slaughterhouses' operations and facilities."  *Id.* at 456 (citing 9 C.F.R. § 300.1 *et seq.* (2011)).  Defendant argues that the FMIA and its regulations preempt Tenn. Code Ann. § 14–2–102(a) because the Tennessee law falls "within the scope" of the federal law.  Defendant cites for support regulations adopted by the FSIS and found at 9 C.F.R. §§ 416.2(b) and 416.5(b) & (c).

Section 416.2(b) governs the construction of meat processing facilities and reads as follows:

> (1) Establishment buildings, including their structures, rooms, and compartments must be of sound construction, be kept in good repair, and be of sufficient size to allow for processing, handling, and storage of product *in a manner that does not result in product adulteration or the creation of insanitary conditions*.

> (2) Walls, floors, and ceilings within establishments must be built of durable materials impervious to moisture and be cleaned and sanitized *as necessary to prevent adulteration of product or the creation of insanitary conditions*.

> (3) Walls, floors, ceilings, doors, windows, and other outside openings must be constructed and maintained to prevent the entrance of vermin, such as flies, rats, and mice.

> (4) Rooms or compartments in which edible product is processed, handled, or stored must be separate and distinct from rooms or compartments in which inedible product is processed, handled, or stored, *to the extent necessary to prevent product adulteration and the creation of insanitary conditions*.

9 C.F.R. §§ 416.2(b) (emphasis added).   Section 416.5 governs employee hygiene at meat processing facilities and includes requirements for employee clothing and disease control.   The regulation requires meat processing workers to start the workday with a clean apron or outer garment and change during the workday "as often as necessary to prevent adulteration of product and the creation of insanitary conditions." 9 C.F.R. § 416.5(b).  The regulation further requires the exclusion of "[a]ny person who has or appears to have an infectious disease . . . from any operations which could result in product adulteration and the creation of insanitary conditions until the condition is corrected."  § 416.5(c).

Defendant has not carried its burden at the pleadings stage to show how the FMIA and its regulations preempt Tenn. Code Ann. § 14–2–102(a).  Nothing in the FMIA itself or any of the regulations cited by Defendant preempts the Tennessee statute by implication, under either implied preemption doctrine.  There exists no conflict between federal law under the FMIA and Tennessee law.  Tenn. Code Ann. § 14–2–102(a) protects a person with an objection to taking a COVID-19 vaccine from being required to submit proof of vaccination in Tennessee.  Defendant has not cited any provision in the FMIA or the regulations, requiring meat processors like Defendant to require proof of COVID-19 vaccination, or any other vaccination, for their employees, or compelling workers in meat processing plants to provide proof of vaccination as a term of their employment.  There is then no conflict between the FMIA and its regulations and Tenn. Code Ann. § 14–2–102(a).

And nothing in the FMIA or its regulations implies that "federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 138 S. Ct. at 148.  On the contrary, the FMIA contains a "savings clause" in 21 U.S.C. § 678.  *Harris*, 565 U.S. at 467 n.10 (describing 21 U.S.C. § 678 as the FMIA's "express preemption

clause" and its carve-out for state regulation on "other matters" as a "savings clause").  Section 678's express preemption clause preempts state law on specific matters, while its savings clause permits state regulation "as to 'other matters,' not addressed in the express preemption clause, as long as those matters are consistent with the FMIA." *Id.*; *see also* § 678 ("This chapter shall not preclude any State or Territory or the District of Columbia from making requirement[s] or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.").  The Supreme Court has construed the phrase "other matters" to mean that "state laws of general application (workplace safety regulations, building codes, etc.) will usually apply," as long as the state law or regulation is "consistent with" the FMIA.  *Id.* at 467 n.10.  In the parlance of the field preemption doctrine, § 678 leaves "room for supplementary state regulation" on certain matters regulated under the FMIA.  Whatever those matters may be, the FMIA's savings clause is incompatible with the notion that Congress intended to occupy the entire field of regulation covered by the FMIA.

This just leaves the argument that the FMIA expressly preempts Tenn. Code Ann. § 14–2–102(a).  Section 678's express preemption clause blocks states from adopting requirements that are "within the scope" of the FMIA but only those related to meat processing "premises, facilities and operations" where the state requirements are "in addition to, or different than those made under" the FMIA.  § 678.[13]  The Supreme Court has observed that § 678's express preemption clause "sweeps widely" because it precludes even "non-conflicting" state requirements, if the

---

[13]  Section 678 also expressly preempts state-imposed "[m]arking, labeling, packaging, or ingredient requirements" "in addition to, or different than" the FMIA's.  § 678.  Because the Tennessee statute at issue is a law of general application and does not implicate in any way the labeling or packaging of meat product, the FMIA's preemption of state-mandated marking or labeling requirements is not relevant in this case.

requirements "fall within the scope of the Act and concern a slaughterhouse's facilities or operations." *Harris*, 565 U.S. at 559–60.

The Supreme Court considered how a state law might fall "within the scope" of the FMIA and its regulations in *National Meat Association v. Harris*, 565 U.S. 452 (2012). California Penal Code § 599f prohibited certain kinds of conduct related to the treatment of disabled pigs in slaughterhouses as animal cruelty and made those acts a felony under state law. The issue presented in *Harris* was whether the FMIA preempted California law because the animal cruelty law came "within the scope" of the FMIA and its regulations. In a unanimous opinion, the Supreme Court concluded that the FMIA preempted the California law because it went beyond the FMIA and its regulations and "impose[d] additional or different requirements on swine slaughterhouses." *Id*. at 460 (finding that the California law "compels them to deal with nonambulatory pigs on their premises in ways that the [FMIA] and regulations do not."). After examining the requirements of multiple regulations under the FMIA, the Supreme Court carefully considered how the federal regulations and the California law imposed additional or different requirements for meat processors, for instance, how meat processors handle animals that were disabled upon arrival at a slaughterhouse, 9 C.F.R. § 309.2, or animals that became disabled after coming to a slaughterhouse, § 325.20(c). *Harris* concluded that "California's statute substitutes a new regulatory scheme for the one the FSIS uses," that is, the California law reached into meat processing plant operations and imposed "additional or different" requirements than the FMIA. *Id.* Therefore, the FMIA expressly preempted the California statute because the state law came "within the scope" of the FMIA and its regulations.

With the *Harris* analysis of express preemption under the FMIA in mind, the question becomes whether Tenn. Code Ann. § 14–2–102(a) comes "within the scope" of the FMIA and

establishes "additional or different" requirements for meat and poultry processors like Defendant. Tenn. Code Ann. § 14–2–102(a) prohibits a "private business" from "compel[ling] or otherwise tak[ing] an adverse action against a person to compel the person to provide proof of vaccination if the person objects to receiving a COVID-19 vaccine for any reason." Tenn. Code Ann. § 14–2–102(a). On its face and unlike the California law in *Harris*, the Tennessee statute is a law of general application. It prohibits any "private business," and not just meat processors, from compelling a "person," be it an employee, an invitee, or any other individual, to produce "physical documentation or digital storage of a person's receipt of a COVID-19 vaccine." Tenn. Code Ann. § 14–1–101(16) (defining "proof of vaccination"). Tenn. Code Ann. § 14–2–102(a) does not regulate meat processing "premises, facilities and operations," much less create state requirements "in addition to, or different than those made under" the FMIA. § 678. The very nature of the Tennessee law clearly distinguishes it from the California law analyzed by the Supreme Court in *Harris*.

For its part, Defendant has not shown that Tenn. Code Ann. § 14–2–102(a) regulates a matter "within the scope" of the FMIA related to meat processing "operations" and that it imposes "additional or different" requirements on Defendant than those under federal law. *Harris*, 565 U.S. at 559–60. Defendant maintains that Tenn. Code Ann. § 14–2–102(a) implicates meat processing "operations" because the FMIA regulations already require certain steps when a worker at a meat processing plant has an infectious disease. Under 9 C.F.R. § 416.5(c), the FMIA's regulation on employee hygiene and disease control, a meat processing employer must "exclude" "any person who has or appears to have an infectious disease . . . from any *operations* which could result in product adulteration and the creation of insanitary conditions until the condition is corrected." 9 C.F.R. § 416.5(c) (emphasis added). The regulation clearly treats an employee's

infectious disease as an "operational" matter.  A meat processing employer is required to remove an employee with an infectious disease from "operations," though only "operations" in which the employee's illness could create "insanitary conditions" or render meat "adulterated," terms the regulation does not actually define.[14]  Defendant argues then that, even though the regulations do not address vaccination, vaccination falls "within the scope" of Defendant's "operations" and under § 416.5(c)'s regulation of employees with "infectious disease."

The Court finds that this argument suffers from a number of problems.  First, Defendant can only argue in the abstract that Tenn. Code Ann. § 14–2–102(a) falls "within the scope" of the FMIA and its regulations concerning Defendant's "operations," based on nothing more than the broad notion that COVID-19 vaccination falls within the scope of "infectious disease." Even at such a high level of generality, Defendant's point is not convincing.  The regulation does not address all illnesses among all employees working in all operations at meat processing plants. Section 416.5(c) dictates what actions Defendant must take when a worker is ill, and then only a worker with an "infectious disease" and whose job responsibilities might risk adulterating meat or creating insanitary conditions in the plant.  Tenn. Code Ann. § 14–2–102(a) has nothing at all to say about that.  Tennessee simply prohibits Defendant from taking an "adverse action" against an employee for their refusal to provide proof of vaccination.  The Tennessee law does not dictate how a meat processor must treat an employee with an infectious disease.  This does not show that Tenn. Code Ann. § 14–2–102(a) falls "within the scope" of the FMIA and its regulations.

---

[14] The FMIA contains a multi-factor test to determine whether meat or a meat product is "adulterated" for purposes of the statute.  Most relevant here, meat is "adulterated" "if it bears or contains any poisonous or deleterious substance which may render it injurious to health," and in cases where the substance is not an added substance, the meat is not deemed "adulterated" "if the quantity of such substance in or on such article does not ordinarily render it injurious to health." 21 U.S.C. § 601(m)(1).

Defendant's argument relies on a largely contingent, and at this stage of the case mostly unsupported, assumption that FSIS could have adopted a vaccine mandate as part of its regulation on infectious disease.  In order to close the gap between Tenn. Code Ann. § 14–2–102(a)'s protection against being compelled to furnish "proof of vaccination" and 9 C.F.R. § 416.5(c)'s requirement to remove an employee with an infectious disease from certain "operations," Defendant hypothesizes FSIS could have required meat and poultry workers to have a COVID-19 vaccine.  But Defendant cites no statute, case, or evidentiary support for their supposition that FSIS had the authority to require vaccination for all workers at meat and poultry processing plants. There clearly exists some question about what authority federal agencies had to issue vaccine mandates during the pandemic.  *E.g. Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (holding that Secretary of Health and Human Services had authority to mandate vaccinations for healthcare workers in health setting receiving Medicare and Medicaid funding); *Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 665 (holding that challengers were likely to prevail on the merits of their challenge to OSHA's nationwide vaccine mandate); *Commonwealth v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023) (holding that challengers were likely to succeed on the merits of their challenge to the President's vaccine mandate for federal contractors); *Doster v. Kendall*, 54 F.4th 398, 421 (6th Cir. 2022) (holding that members of the U.S. Air Force were likely to succeed on the merits of their challenge to the Air Force's vaccine mandate); *Livingston Educ. Serv. Agency v. Becerra*, 35 F.4th 489, 491 (6th Cir. 2022) (holding that challengers were not likely to succeed on the merits of their challenge to an HHS vaccine mandate for the "Head Start program staff, contractors, and volunteers").  The OSHA guidance cited by Defendant also "suggested" the viability of requiring workers to wear masks and undergo regular testing in lieu of vaccination.  Defendant has not shown why the meat and poultry industry was different or why FSIS would have rejected these

alternative measures.  This is insufficient to demonstrate a "clear and manifest purpose" on the part of the federal government to override a traditional police power of the States.  *Wyeth*, 555 U.S. at 565.

The more fundamental problem with Defendant's argument is that Defendant has not shown exactly how Tennessee law "imposes additional or different requirements" on "operations" within a meat processing facility.  Constitutional avoidance requires the Court to "formulate a rule of constitutional law [no] broader than is required *by the precise facts* to which it is to be applied." *Torres*, 938 F.3d at 754–55 (emphasis added) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed. 688 (1936) (Brandeis, J., concurring)).  But Defendant has not adduced any evidence to support their claim that the FMIA expressly preempts Tenn. Code Ann. § 14–2–102(a), and certainly not "the precise facts" to which their express preemption theory is to be applied.  Defendant has raised the preemption issue as an affirmative defense in a Rule 12(b)(6) motion.

Absent from Defendant's challenge, coming as it does at the pleadings stage, is any proof concerning the "scope" of the FMIA and its regulations or how Tennessee law falls "within the scope."  One implication of Defendant's argument is that a worker who refused a COVID-19 vaccine was more likely to contract the virus and therefore become unable to work in certain "operations."  However, that supposition does not show why a broad vaccine mandate, covering all its workers, falls within the scope of § 416.5(c).  Defendant has not shown which "operations" at its Newbern or Union City plants fall within the scope of § 416.5(c).  There is no evidence to show how FSIS inspectors construe and apply § 416.5(c) or what steps Defendant takes to comply with § 416.5(c), either in the normal course or in the context of COVID-19.

Furthermore, Defendant has not introduced any evidence to show how COVID-19 infections affected operations at the Newbern or Union City plants or Defendant's ability to meet the requirements of § 416.5(c) during the pandemic.  Even more specific to this case, Defendant offered no evidence to prove what Plaintiffs' jobs entailed, how coming down with an "infectious disease" would have affected their ability to do their jobs, or why alternatives to mandatory vaccination would not have allowed Defendant to comply with the regulation and permitted Plaintiffs to carry out their work.[15]  This and other proof may have connected the dots between the "scope" of 9 C.F.R. § 416.5(c), its impact on Defendant's "operations" in plants like the ones in Newbern and Union City, and how Tenn. Code Ann. § 14–2–102(a) introduced "additional or different" requirements than those in the regulation.  If Defendant had wanted to make a more particularized showing that Tenn. Code Ann. § 14–2–102(a) falls "within the scope" of 9 C.F.R. § 416.5(c), Defendant could have marshaled evidence to fill in critical gaps in its preemption theory.

The absence of "precise facts" related to the scope of the FMIA and 9 C.F.R. § 416.5(c) and the application of Tenn. Code Ann. § 14–2–102(a) matters in this case.  *Torres*, 938 F.3d at 754–55.  The Court concludes that Defendant has not demonstrated at the pleadings stage why Tenn. Code Ann. § 14–2–102(a)'s protections for persons who hold an objection to COVID-19 vaccination fall "within the scope" of the FMIA or how the Tennessee law "endeavors to regulate

---

[15] As alleged in the amended complaint (ECF No. 21) Plaintiffs Reed and Spaulding were registered nurses at Defendant's Newbern plant; Plaintiff Goetz was a maintenance worker at the Union City plant; and Plaintiff Crawford was a supervisor at the Newbern plant. Based on the job titles in the pleadings alone, Defendant has not shown how any of the Plaintiffs were involved in "any operations which could result in product adulteration and the creation of insanitary conditions until the condition is corrected."  9 C.F.R. § 416.5(c).  Without that showing, Defendant has not demonstrated that § 416.5(c) would require it to exclude any Plaintiff from plant operations in the event the Plaintiff contracted COVID-19 or any other infectious disease.

the same thing, at the same time, in the same place — except by imposing different requirements" than 9 C.F.R. § 416.5(c) or any other regulation promulgated under FMIA. *Harris*, 565 U.S. at 468.

As the party raising the defense of preemption, Defendant has not carried its burden to overcome the presumption against preemption, nor has it shown that any source of federal law preempts Plaintiffs' claims under Tenn. Code Ann. § 14–2–102(a).

Because Plaintiffs' Title 14 claim is not preempted, the Court must analyze that claim on the merits. Clearly, Defendant meets the definition of a "private business" as defined in Title 14. *See* Tenn. Code Ann. § 14–1–101(15) (defining a "private business" as a "corporation ... engaged in business or commerce" in Tennessee). Defendant's decision to place Plaintiffs on a one-year leave without pay without the assurance of being able to reclaim their jobs constitutes an "adverse action." *See* § 14–1–101(1)(B) (defining "adverse action" as "(A) discriminat[ion] against a person by denying the person employment, privileges, … or other benefits; or (B) discharge, threaten, or otherwise discriminate against an employee in any manner that affects the employee's employment."   And Defendant took an "adverse action" against Plaintiffs to compel them to provide "proof of vaccination," that is, "physical documentation or digital storage of a person's receipt of a COVID-19 vaccine." § 14–1–101(16). However, Defendant contends that Plaintiffs' Claim Eleven fails because the alleged adverse actions occurred prior to the enactment date of the statute and there is no retroactivity provision in the statute.

The pertinent dates in this matter are as follows.  Plaintiffs filed their lawsuit on October 7, 2022 (ECF No. 1-1), and the matter was removed to this Court on October 15, 2022.  (ECF No. 1.)  Plaintiffs allege that Defendant "imposed" its vaccine mandate on August 3, 2021. (Amd. Cmplt. ¶ 3, ECF No. 21.) "Tyson responded to their employees seeking medical or religious

exemptions by informing those employees that they would be effectively terminated on November 1, 2021 and placed on unpaid leave of absence with no assurance that they would be allowed to return to the workplace for up to one year." (*Id.* at ¶ 4.) Defendant's HR Department told employees that "they need an answer by October 18 [2021] as to the acceptance of the accommodation." (*Id.* at ¶ 34.) Plaintiff Reed was told "that she must accept the accommodation as quickly as possible and if not accepted then on November 1, 2021 Tyson will be sending out separation letters." (*Id.*)

After the November 1, 2021 deadline passed, "Tyson employees who [were] unvaccinated [were] terminated, either actually or constructively through unpaid leave." (*Id.* at ¶ 4.) Also, after the November 1, 2021 deadline, "Plaintiffs who have refused to receive the COVID-19 vaccine have been offered only unpaid leave, with the alternative being immediate termination." (*Id.* at ¶ 36.) "Defendant's so-called 'accommodation' is a thinly-veiled punishment that constructively terminates employment. (*Id.* at ¶ 136.)[16]

Title 14 of the Tennessee Code Annotated took effect on November 12, 2021.

Tyson lifted its vaccine requirement on October 31, 2022.

Defendant argues that Plaintiffs cannot state a claim under Title 14 because they were placed on unpaid administrative leave on November 1, 2021, prior to the date that Title 14 became effective. They point out that Title 14 is not retroactive. Plaintiffs have responded that their unpaid leave and ultimate termination were ongoing acts of discrimination. They also contend that Title 14 may be applied retroactively.

---

[16] This allegation was made in the context of Plaintiffs' First Amendment claim which has been dismissed. However, the allegation is illustrative as to how Plaintiffs viewed the alleged adverse action taken against them.

Defendant argues that Plaintiff cannot obtain relief based on their unpaid leave, which began November 1, 2021, eleven days before Title 14 became the law in Tennessee. Plaintiffs have responded that their unpaid leave is akin to a continuing violation, which, though it began prior to Title 14's effective date, continued after the law went into effect.  The Court recently addressed this issue in *Hayslett v. Tyson Foods, Inc.*, No. 1:22-CV-1123-STA-JAY, 2022 WL 12029381 (W.D. Tenn. Oct. 20, 2022),[17] and found that the complaint plausibly alleged that the plaintiff's ongoing unpaid leave violated Tennessee law.  That is, the complaint plausibly alleged that Defendants took an "adverse action" against Plaintiff after the law had taken effect.

In *Hayslett*, this Court first addressed the retroactivity argument.

Defendants' retroactivity point is true, as far as it goes. Generally speaking, Tennessee statutes do not apply retroactively, subject to narrowly defined exceptions. *Nutt* [*v. Champion International Corporation*, 980 S.W.2d 365, 368 (Tenn. 1998)] ("An exception to the prospective-only application exists for statutes which are remedial or procedural in nature."). The critical distinction between *Nutt* and Plaintiff's case is the fact that *Nutt* addressed an amendment to an existing law, specifically the remedies available to an employer under Tennessee worker's compensation law. Plaintiff's case against Defendants is not that an amendment to an existing law should apply retroactively to an injury happening before the effective date of the amendment. Rather Plaintiff seeks to hold Defendants liable for violations of an entirely new legislative enactment applied prospectively to address ongoing conduct prohibited by the newly enacted law. *See Bazemore v. Friday*, 478 U.S. 385, 395, 106 S. Ct. 3000, 92 L.Ed.2d 315 (1986) ("A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute."). The fact is Title 14 protects Plaintiff and other similarly situated persons from certain types of adverse actions like unpaid leave, and the Tennessee General Assembly has stated its intention that courts construe Title 14 "broadly" to effectuate its purposes. Tenn. Code Ann. § 14–1–103. To accept

---

[17] The facts in *Hayslett* are slightly different from those in the present case. In *Hayslett*, the plaintiff employee "specifically requested permission to return to work in May 2022. Defendants denied her requests, telling Plaintiff she could not return until she was vaccinated and that she would 'continue to be locked out of the facility.' The Complaint alleges that Defendants have therefore terminated or constructively terminated Plaintiff's employment." *Id.* at *3 (citations omitted).  In this case, the amended complaint contains no allegations of any action taken by either party after November 1, 2021.

> Defendants' position would not just narrow Title 14's application but "would have the effect of exempting from liability" any employer who decided to take an adverse action against an employee (and just days before Title 14 took effect) and then adhered to its decision even though the employer was violating the new law. *Bazemore*, 478 U.S. at 395, 106 S. Ct. 3000. The Court finds Defendants' retroactivity argument to be unpersuasive.

Hayslett, 2022 WL 12029381, at *4.

This Court then addressed Defendants' next argument that "any claim Plaintiff may have had based on her unpaid leave constitutes a discrete employment action and therefore accrued prior to the effective date of Title 14." *Id.* at *5. The Court summarized Defendants' argument as "any cause of action available to Plaintiff based on her unpaid leave would have accrued no later than November 1, 2021. Because Title 14 had not yet taken effect as of that date, Plaintiff cannot now hold Defendants liable for a violation of the law." *Id.* The Court rejected Defendants' argument because "[u]nder Tennessee's traditional accrual rule, Plaintiff's Title 14 claim could not have accrued on November 1, 2021. Plaintiff did not have 'a cause of action and the right to sue' on that date." *Id.* (citations omitted). Thus, "Defendants' argument that the cause of action based on a statutory violation somehow accrued at a time before the statute's enactment and when Plaintiff could not have filed suit [was] unconvincing, particularly at the pleadings stage and where Defendants ask the Court to decide the question as a matter of law." *Id.* Based on this analysis, the Court found that the *Hayslett* complaint plausibly alleged that the ongoing unpaid leave offered to the plaintiff employee violated Title 14 and the motion to dismiss was denied. *Id.*

Likewise, in the present case, the Court finds that Plaintiffs Reed, Goetz, Spaulding, and Wharton have sufficiently alleged a violation of Title 14 despite the fact that their unpaid leave began before the effective date of the statute, especially in light of the allegation that "[t]hey were informed that after one year they would be effectively terminated from their position at Tyson." (Amd. Cmplt. ¶ 30, ECF No. 21.) Clearly this "effective termination" would have occurred after

the enactment date.  Accordingly, the motion to dismiss this claim as to these four plaintiffs is denied. However, the motion is granted as to Plaintiff Crawford's Title 14 claim.

Unlike the other four plaintiffs, Plaintiff Crawford has alleged that, at some point, he took another job.  The amended complaint specifically alleges that Crawford "sought a vaccine exemption on religious grounds" and "was forced to leave his position at Tyson and seek alternative employment due to the vaccine mandate." (Amd. Cmplt. ¶ 12, ECF No. 21.) He does not allege that he was placed on unpaid leave, nor does he allege any action taken against him that occurred after the enactment date of Title 14.

This is not to say that Crawford had to affirmatively plead the date he resigned or "was forced" from his position. But, once Defendant raised the issue that no action against Plaintiff was taken after November 12, 2021, it was incumbent upon each plaintiff to point to something in the record from which the Court could find that the plaintiff had plausibly alleged actions taken by Defendant after that date. The four other remaining plaintiffs have done so with their allegations of a year's unpaid leave beginning November 1, 2021, but Plaintiff Crawford has not done so. Therefore, the Title 14 claim brought by him must be dismissed.

In conclusion, Defendant's motion to dismiss is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.  The motion is **GRANTED** as to Claim Four brought by Plaintiffs Reed, Goetz, Spaulding, Wharton, and Crawford, Claim Seven brought by Plaintiffs Reed, Goetz, Spaulding, Wharton, and Crawford, and Claim Eleven brought by Plaintiff Crawford.

The motion is **DENIED** as to Claim Eleven brought by Plaintiffs Reed, Goetz, Spaulding, and Wharton.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  June 1, 2023.